## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DONNA TRUJILLO-AGUILAR,**

      **Plaintiff,**

v.                                     **No. CIV 02-0803 JP/LCS**

**JOANNE B. BARNHART**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## <u>MEMORANDUM OPINION</u>

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse or Remand Administrative Agency Decision (Doc. 10), filed November 12, 2002, and Defendant's Motion to Reverse and Remand (Doc. 12), filed December 23, 2002. The Commissioner of Social Security issued a final decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. The United States Magistrate Judge, acting upon consent[1] and designation pursuant 28 U.S.C. § 636(c), having considered the Motions, briefs, administrative record, and applicable law, finds that Plaintiff's Motion to Reverse and Remand for an immediate award of benefits should be **GRANTED** and that Defendant's Motion to Remand for further development of the record should be **DENIED,** and that this matter should be remanded to the Commissioner for an immediate award of benefits.

**Procedural Background**

      Plaintiff, now thirty-one years old, filed her applications for disability insurance benefits and

---

[1] Counsel and Chief Judge James A. Parker signed the combined designation and consent form that was filed on October 21, 2002. (Doc. 9.)

supplemental security income on January 18, 1995, alleging disability commencing on January 4, 1995, due to neck and back injury and depression.  (R. at 30-32; 33-34; 37; 47.)  Plaintiff has a tenth grade education and a GED, with past relevant work as a cashier, fast food cook, security guard and candy wrapper.  (R. at 18; 61.)

Plaintiff's applications for disability insurance benefits and supplemental security income were denied at the initial level on April 21, 1995, (R. at 35-36), and at the reconsideration level on June 25, 1995.  (R. at 41-43.)  Plaintiff appealed the denial of her applications by filing a Request for Hearing by Administrative Law Judge (ALJ) on August 9, 1995.  (R. at 51-52.)  ALJ Jack D. McCarthy held a hearing in Amarillo, Texas on June 25, 1996.  (R. at 210-212.)  Plaintiff and Keith Gibbs, a vocational expert (VE), testified at the first hearing.  (*Id.*)  At the hearing, Plaintiff amended her onset date to February 18, 1994.  (R. at 108.)

ALJ McCarthy issued a decision on September 27, 1996, (R. at 105-118), analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f).  At the first step of the sequential evaluation process, ALJ McCarthy found that Plaintiff had engaged in substantial gainful activity until January 4, 1995, but not after that date.  (R. at 109.)  At the second step, ALJ McCarthy determined that Plaintiff had severe impairments consisting of back and shoulder injury.  (R. at 109-111.)  At the third step of the sequential analysis, ALJ McCarthy found that the severity of Plaintiff's impairments or combination of impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599.  (R. at 114-115.)

ALJ McCarthy found that Plaintiff was not credible due to numerous, significant inconsistencies and exaggerations in her allegations.  (R. at 112-113.)  ALJ McCarthy found that

Plaintiff retained the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally with the additional functional limitations of no lifting from the ground and only occasional stooping. (R. at 117.) In light of this RFC, ALJ McCarthy determined that Plaintiff was able to perform her past relevant work as a security guard. (*Id.*)

On October 7, 1996, Plaintiff filed a request for review of the ALJ's decision. (R. at 120.) On April 15, 1998, the Appeals Council granted the request for review. (R. at 127.) The Appeals Council found that the evidence of record did not support ALJ McCarthy's finding that Plaintiff's situational depression was not a severe impairment because she was hospitalized for major depression on October 14, 1996, and scheduled to undergo further therapy on discharge. (*Id.*) The ALJ was directed to obtain additional evidence concerning Plaintiff's mental impairments, give further consideration to Plaintiff's maximum residual functional capacity, and, if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. (R. at 127-128.)

On administrative remand, Plaintiff submitted additional medical evidence. (R. at 121-175.) However, the Commissioner did not obtain evidence from the providers referenced in Plaintiff's November 12, 1996 letter. (R. at 124.) On November 19, 1999 ALJ William F. Nail held an evidentiary hearing at which Plaintiff appeared without representation. (R. at 235.) At the second hearing, Plaintiff and Bertina Telles, a VE, testified. (*Id.*) After the hearing, Judge Nail held the record open until April 9, 2000, to allow Plaintiff to submit evidence on her August 1999 back surgery. (R. at 181.)

ALJ Nail issued his decision on July 13, 2000, (R. at 17-29), analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f). (R. at 18.) At the first

step of the sequential evaluation process, ALJ Nail found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (R. at 23.) At the second step, ALJ Nail determined that Plaintiff had severe impairments consisting of degenerative lumbar and cervical disc disease, depression, post traumatic stress disorder, personality disorder, and a history of alcohol and drug abuse. (R. at 19.) At the third step of the sequential analysis, ALJ Nail found that the severity of Plaintiff's impairments or combination of impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. (*Id.*)

ALJ Nail found that Plaintiff retained the residual functional capacity to perform a limited range of light work with lifting of no more that ten pounds additionally limited to simple, non-public, low stress work involving one or two step processes. (R. at 20.) In light of this RFC, ALJ nail determined that Plaintiff was unable to perform her past relevant work as a cashier, fast food cook, security guard or candy wrapper. (R. at 21.) At step five, using the Medical-Vocational Guidelines (Grids) as a framework, and relying on the testimony of the VE that Plaintiff could perform the jobs of production line assembly worker, grinding machine operator and ornament hand maker, ALJ Nail concluded that Plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the national economy. (R. at 22.) ALJ Nail additionally determined that Plaintiff likely had a disabling substance abuse impairment, and to the extent that her alcoholism and drug abuse precluded her ability to perform such jobs, the substance abuse would be material to a finding of disability. (R. at 23.) Thus, ALJ Nail concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.*)

On July 20, 2000, Plaintiff filed a request for review of ALJ Nail's decision, (R. at 7-8), and submitted additional evidence. (R. at 181-209). On May 6, 2002, the Appeals Council denied the

request for review, (R. at 5-6), and the decision of ALJ Nail became the final decision of the Commissioner for judicial review purposes.  On July 5, 2002, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

## Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether correct legal standards were applied.  *See Hamilton v. Sec'y of Health and Human Servs,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Sec'y of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993)(*quoting Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (*citation omitted*)).  A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record.  *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. § 423(d)(1)(A)).  At the first four levels of the sequential evaluation process, the claimant must show that she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the

Commissioner to show that the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *See id.*

**Administrative Record**

On February 18, 1993, Plaintiff was treated in the emergency room of Queens Medical Center in Honolulu, Hawaii after she was involved in a motor vehicle accident. (R. at 131.) Dr. Wynn T. Wakuzawa, M.D. diagnosed lumbar muscle strain and discharged Plaintiff with instructions to take ibroprophen and call him if she experienced numbness, weakness, or tingling in her legs, or problems with bladder or bowel function. (R. at 131-132.) Plaintiff was also directed to make a follow up appointment with Dr. Kaan. (R. at 132.)

On January 15, 1995, Plaintiff was admitted to Eastern New Mexico Medical Center through the emergency room after she overdosed on Percodan and Soma. (R. at 88.) Plaintiff explained that she attempted suicide due to boyfriend problems and frustration over her back pain. (*Id.*) Dr. Lawrence J. Barbour diagnosed situational depression with an overdose of medication and suicide attempt. (*Id.*) Dr. Barbour referred Plaintiff to counseling. (*Id.*)

On February 10, 1995, Dr. Lisa R. Reinicke, D.C., wrote that Plaintiff was under her care for injuries arising from an automobile accident on February 18, 1994, that Plaintiff would be disabled for at least twelve months pending neurological evaluation and possible surgical intervention. (R. at 91.)

On April 16, 1995, Dr. Leonore A. Herrera, M..D. performed a physical evaluation of Plaintiff. (R. at 85.) Plaintiff reported that she had been in an auto accident in 1994 and had injured her right shoulder, right side, and lower back. (*Id.*) Plaintiff had x-rays at her chiropractor's office in January 1995, and was told that she had a whiplash injury with a possible herniated disc at L5.

6

(*Id.*)  Plaintiff reported she was hospitalized in January 1995 after she overdosed on pain medications after a breakup with her boyfriend.  (*Id.*)  Plaintiff reported that she could sit for ten minutes, stand for ten minutes, walk twenty feet, walk twenty feet, lift light objects and that she did not drive.  (*Id.*)  Plaintiff worked as a cashier at Wal-Mart until January 1995.  (*Id.*)

Physical examination by Dr. Herrera revealed that hip forward flexion caused pain in the low back, but that backward extension, abduction and adduction were normal.  (R. at 86.)  Cervical spine motion was normal, but painful.  (*Id.*)  Lumbar spine flexion had marked limitation, possibly self-limited.  (*Id.*)  Reflexes were normal and there was no atrophy or deformity.  (*Id.*)  Dr. Herrera concluded that sitting was not affected by the impairment, but that lifting and carrying were limited due to an inability to stoop.  (*Id.*)  Limitations on standing and walking were not supported by the examination.  (*Id.*)  Reaching, feeling, hearing, touching and traveling were not affected.  (*Id.*)  Plaintiff said that she would have to stretch in order to be comfortable for prolonged periods of sitting. (*Id.*)  Dr. Herrera's diagnosis was history of motor vehicle accident with right-sided shoulder and back injury, chronic back pain that apparently limited Plaintiff's ability to work, limited lumbosacral forward flexion, and a history of suicide attempt with no apparent psychiatric counseling. (R. at 87.)

In a disability report, Plaintiff stated that she was unable to bend over or sit for a long time without her legs going to sleep.  (R. at 57.)  Plaintiff reported that she could not stand up for very long and could not bend down.  (*Id.*)  She also complained that her legs were swollen and her neck hurt.  (R. at 65.)  On a typical day, Plaintiff cleaned the house, watched her sister's baby and washed clothes.  (*Id.*)  Plaintiff was able to shop, prepare meals, do crossword puzzles, walk, and go to the movies.  (R. at 66.)  She visited and shopped with relatives two to three times per week.  (*Id.*)

7

Plaintiff performed leg exercises and walked twice a week.  (R. at 66-67.)  She was able to walk a half a block, but could not climb stairs.  (R. at 67.)

On May 3, 1995, Plaintiff wrote that she was unable to lift her dirty clothes to load them into the washer, or to stand or sit for long periods of time.  (R. at 73.)  Plaintiff felt that her back, legs, arms and fingers were swollen.  (*Id*.)  On May 26, 1995, Plaintiff stated that she could no longer care for her young nephew because she almost dropped him when her back "locked up." (R. at 71.)

On June 26, 1995, Dr. Haq N. Babur, M.D. performed a neurologic spinal/musculoskeletal evaluation of Plaintiff.  (R. at 135.)  Plaintiff described severe low back pain and lumbosacral radicular pain that was worse with activities such as lifting, carrying, pushing, pulling and being in one position.  (*Id*.)  Plaintiff reported pain with the onset of activity, that the pain never completely let up and that the pain significantly interfered with her sleep.  (*Id*.)  Plaintiff had no bladder or bowel difficulties, but reported recurrent weakness in the right leg.  (*Id*.)

Neurological examination revealed a mild degree of weakness in the muscles of the right leg and foot.  (R. at 135.) There was a decreased pinprick sensation in both the L5 and S1 distribution on the right.  (*Id*.)  Plaintiff had positive straight-leg raising at about forty-five degrees, that induced back and right leg pain.  (*Id*.)  Plaintiff limped on her right leg.  (*Id*.)  There was moderate global limitation of the lumbosacral spine as well as para lumbar muscle spasm and tenderness.  (*Id*.)  Despite these problems, Dr. Babur felt that Plaintiff's neuromuscular examination was essentially within normal limits. (R. at 135-136.)  X-rays were suboptimal in quality, but were not grossly abnormal except for a decrease in the intervertebral disc space at L5-S1.  (R. at 136.)

Dr. Babur diagnosed lumbosacral compression radiculopathy most likely secondary to degenerative disc disease, with definite motor weakness.  (R. at 136).  Dr. Babur recommended a

work up with a CT or MRI of the lumbar spine and EMG and nerve conduction studies of the right leg. (*Id.*) Dr. Babur opined that Plaintiff should not return to a job situation with excessive lifting, carrying, pushing or pulling until her pain resolved. (*Id.*)

On August 30, 1996, Dr. Babur reported that he had re-evaluated Plaintiff. (R. at 121.) Plaintiff described severe, sharp pain that was worse with activities such as lifting, carrying, pushing, pulling, or staying in one position. (*Id.*) Plaintiff stated that she could walk half a block without developing distressing symptoms. (*Id.*) The pain interfered with her sleep. (*Id.*) Plaintiff complained of tingling, numbness and weakness in the right leg and reported that her right leg gave out from time to time. (*Id.*)

Neurological examination revealed a mild degree of weakness in the right leg and foot muscles, and decreased pinprick sensation in the L5 and S1 distribution area on the right side. (R. at 121.) Plaintiff had a slight limp on the right side. (*Id.*) Spinal examination revealed a positive straight leg raising at about forty five degrees on the right side, mild global range of motion limitation on flexion and extension by about one third of the normal range, and para lumbar muscle spasm most marked on the right. (R. at 122.) Dr. Babur diagnosed compression lumbosacral radiculopathy, L5 and/or S1, right side, most likely secondary to degenerative disc disease, and recommended a work up with CT or MRI of the lumbar spine to delineate the origin of the pain and an EMG and nerve conduction study. (*Id.*) Dr. Babur opined that Plaintiff could not return to work until a satisfactory level of pain relief was achieved. (*Id.*)

On October 14, 1996, Plaintiff was diagnosed with major depression. (R. at 129.) Plaintiff was prescribed Zoloft and referred to counseling. (*Id.*) Plaintiff pain status was noted as "no problem." (*Id.*) The record indicates that Plaintiff received treatment at Sunrise Mental Health

Program, the Texas Panhandle Mental health Authority and Patricia L. Erwin, MSW, but treatment records from these providers were not included in the administrative record. (R. at 124.)

On January 27, 1998, Dr. Meenakshi Nayak, M.D. performed a medical evaluation of Plaintiff. (R. at 150.)  Plaintiff walked with a fairly normal gait and was able to squat down and get up.  (*Id.*)  There was some limitation of the lumbosacral flexion and extension with pain and tenderness over the paraspinal muscle. (*Id.*)  Cervical range of motion was normal. (*Id.*)  There was a normal range of motion in all joints in both upper and lower extremities with good strength and normal reflexes and minimal sensory impairment in the back of her right thigh. (*Id.*)  Cervical spine x-ray showed mild narrowing of the C5, C6 interspace with small osteophytes and minimal degenerative changes of the lumbar spine with narrowing at L5-S1. (R. at 151.)  Dr. Nayak recommended that Plaintiff be referred to the Division of Vocational Rehabilitation and placed in a work and physical rehabilitation program. (*Id.*)

On March 25, 1998, Chris E. Gonzales, D.C. wrote that he had seen Plaintiff on March 19, 1998, for the purposes of examination and treatment of severe low back pain with radiation to the right leg.  (R. at 137.)  Dr. Gonzales diagnosed lumbar disc syndrome.  (*Id.*)  Adjustments were not helpful. (*Id.*)  Dr. Gonzales recommended bed rest and ice, and referred Plaintiff to Dr. Pennington. (*Id.*)

On May 6, 1998, Philip A. Street, Ph.D., LPCC, of Counseling Associates,[2] recounted that Plaintiff had been diagnosed with major depression, and had a history of substance abuse, back and neck injury, pyelonephritis and severe psychosocial stressors due to sexual abuse and rape. (R. at 129-

---

[2]  Plaintiff's treatment records from Counseling Associates were not included in the administrative record.

130.)  Plaintiff had been prescribed Zoloft, which was discontinued in favor of Prozac.  (*Id.*)  Dr. Street's diagnosis was major depression, recurrent, severe, chronic and assessed Plaintiff a Global Functioning Assessment Scale (GAF) score of 45.[3] (*Id.*)

Dr. Street emphasized that Plaintiff's condition was severe due to her affective disorder, which was separate and apart from her substance abuse disorder.  (R. at 130.)  In Dr. Street's opinion, Plaintiff's difficulties restricted her activities of daily living to a marked degree, caused frequent impairments of concentration, persistence and pace leading to task failures in employment and at home and affected her social functioning to a marked degree.  (*Id.*)  Due to psychiatric and physical disabilities, Plaintiff experienced episodes of decompensation and intensification of her symptoms causing her to repeatedly withdraw from employment or work-like settings. (*Id.*)  Dr. Street wrote that Plaintiff had been disabled since October 14, 1996, that he did not anticipate a substantial improvement for at least one year, and that Plaintiff should continue her treatment and Counseling Associates, which would coordinate services with the Department of Vocational Rehabilitation.  (*Id.*)

On May 13, 1998, Lynn B. Daugherty, Ph.D. performed a psychological evaluation on Plaintiff upon referral from the Chaves County Income Support Division.  (R. at 139.)  Plaintiff had a difficult childhood.  (R. at 139-140).  Plaintiff was sexually assaulted when she was fifteen and when she was twenty-four.  (R. at 140.)  At the age of sixteen, she was knocked unconscious when her

---

[3]A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. Plaintiff's GAF score corresponded to serious impairment in social relations and occupational functioning.  (*Id.*)

boyfriend hit her with a wrench.  (*Id.*)  Plaintiff experienced fainting spells in the following months.
(*Id.*)  The same boyfriend choked her the following year until she almost passed out.  (*Id.*)  Plaintiff
had been in two car accidents, one of which injured her back.  (*Id.*)

Plaintiff told Dr. Daugherty that she had problems with bronchitis and was using an Albuterol
inhaler. (R. at 140.)  Plaintiff was prescribed Darvocet and a muscle relaxant for her back pain, but
she only took the drugs about five times a week due to the expense.  (*Id.*)  Plaintiff took
Promethazine for problems with vomiting caused by the bronchitis.  (*Id.*)  Plaintiff also regularly
induced vomiting as a weight control measure.  (*Id.*)  Plaintiff had been taking Prozac since January
1998, but it was not helping her. (*Id.*)

Plaintiff recounted to Dr. Daugherty that she left school in tenth grade.  (R. at 140.)  She was
in special education classes for assistance in reading in elementary school, but otherwise received no
special assistance.  (*Id.*)  Plaintiff was suspended from high school twice, once for bringing a gun to
school.  (*Id.*)  Plaintiff participated in ROTC in high school.  (*Id.*)  After she left high school, Plaintiff
completed a training program in culinary arts with the Roswell Job Corps Program.  (*Id.*)  In 1992,
Plaintiff obtained her GED.  (*Id.*)  Plaintiff was unemployed and lived with her mother. (R. at 141.)
Plaintiff was able to speak both English and Spanish.  (R. at 145.)

Plaintiff told Dr. Daugherty that she started drinking regularly at age fifteen and abused
alcohol until 1994.  (R. at 141.)  From age fifteen through seventeen Plaintiff used marijuana and
amphetamines regularly and tried cocaine.  (*Id.*)  At the time of the interview, Plaintiff occasionally
drank and used marijuana. (*Id.*)  Plaintiff was arrested for public intoxication and fifteen and was later
convicted of DWI and causing an auto accident.  (*Id.*)  At age eighteen, Plaintiff was convicted of
consumption of alcohol by a minor.  (*Id.*)

Dr. Daugherty wrote that Plaintiff was hospitalized in 1996 and 1997 for problems relating to depression and attempted suicide. (R. at 141-142.)  Plaintiff was undergoing counseling and planned to continue her mental health treatment. (*Id.*) Plaintiff's mood appeared sad and she reported that she thought about returning to Hawaii and jumping off a bridge. (R. at 142.)  Plaintiff was losing weight through self-induced vomiting and the use of laxatives, but had not discussed these behaviors with her counselor. (R. at 143.)

Dr. Daugherty found that Plaintiff was properly oriented to time, place and person and her memory appeared to be intact.  (R. at 143.)  Her intellectual functioning was in the average to below average range.  (*Id.*)  Her judgment appeared to be strongly influenced by depressive thinking.  (*Id.*)  Plaintiff's conversation was coherent and reflected intact thought processes.  (*Id.*)  Plaintiff reported that she saw "shadows," heard voices calling her name, and saw a "spirit" in her living room in 1995, but denied outright hallucinations.  (*Id.*)  No obviously delusional material was elicited. (*Id.*)

Plaintiff's performance on psychological tests indicated mild cerebral dysfunction.  (R. at 143.)  However, Dr. Daugherty noted that Plaintiff's depression and poor attitude made it difficult to ascertain whether Plaintiff was exerting a good effort to complete the tasks properly.  (*Id.*)  Dr. Daugherty felt that Plaintiff's academic skills were at least adequate for everyday activities in a variety of occupations that do not require strong academic skills. (*Id.*)  Plaintiff's MMPI-2 profile was invalid due to extreme overemphasis on unusual and bizarre symptoms.  (*Id.*)  Plaintiff's MCI-III profile indicated a broad tenancy to magnify her level of experienced illness and an inclination to complain and be self-pitying. (R. at 144.)  Dr. Daugherty noted that the profile could have been the result of feelings of extreme vulnerability associated with acute current turmoil.  (*Id.*)

Tests administered by Dr. Daugherty established that Plaintiff's verbal IQ was 68, her

performance IQ was 80 and her full scale IQ was 72. (R. at 144.) Dr. Daugherty wrote that these results should be considered a minimum estimate of Plaintiff's intellectual ability and that her actual abilities might be slightly higher. (*Id*.) Dr. Daugherty concluded that Plaintiff probably functioned in the low average to borderline range of intelligence with nonverbal performance skills slightly better than verbal skills. (R. at 145.) Dr. Daugherty diagnosed major depressive disorder, recurrent; bulimia nervosa, purging type; pain disorder associated with both psychological factors and a general medical condition, chronic; and borderline intellectual functioning. (R. at 146.) Dr. Daugherty opined that Plaintiff would be able to hold gainful employment, at least on a sporadic basis if the depressive symptoms were effectively treated. (*Id*.) Dr. Daugherty also believed that if Plaintiff's depression were alleviated, it was likely some of her problems with chronic pain would improve.

On June 16, 1998, Dr. Street wrote a letter explaining his views of Daugherty's report. (R. at 152-155.) Dr. Street felt that the results of the MMPI-2 profile and MCMI-III were evidence of a "cry for help" rather than an indication that Plaintiff was exaggerating her problems. (R. at 153.) Dr. Street pointed out that Dr. Daugherty's report found that Plaintiff could be suffering from four psychiatric disorders and that Dr. Daugherty recommended further testing. (R. at 154.) Dr. Street also submitted an addendum continuing Plaintiff's comments on her condition. (R. at 155.)

On November 19, 1998, Dr. Robert L. Karp, M.D. performed a psychiatric evaluation. (R. at 156-160.) Plaintiff explained that she was not capable of holding a job because she would "probably get mad at one of the customers and hurt them" because she was "mad." (R. at 156.) Plaintiff attributed this anger to being the victim of two rapes. (*Id*.) Initially, Plaintiff told Dr. Karp that she dropped out of school to get married, but later confided that she had been expelled for bringing a gun to school. (*Id*.)

Plaintiff reported to Dr. Karp that she had difficulty sleeping and was tired.  (R. at 156.)  She did not feel close to family, avoided certain streets, was frightened by certain movies and had lost her appetite. (R. at 157.)  Plaintiff felt "all drugged up" due to her medications, had daily suicidal thoughts, and cried every other day.  (*Id*.)  Plaintiff reported that she did house work, took care of dogs, looked for work, and wrote down her feelings during the day. (R. at 157.)  Plaintiff reported two suicide attempts.  (R. at 158.)  Plaintiff was seeing a counselor and had been prescribed Remeron, which helped a little.  (*Id*.)

Dr. Karp found no evidence of loose associations, perceptual distortions, hallucinations or delusions.  (R. at 159.)  Affect was moderately flattened and of narrow range, but appropriate to the content.  (*Id*.)  Plaintiff was of average intelligence and had no insight into her situation.  (*Id*.)  Her judgment was fair and no memory problems were indicated.  (*Id*.)

Dr. Karp noted inconsistencies in Plaintiff's story and believed that she might be exaggerating or hiding some problem due to shame.  (R. at 159.)  Plaintiff had many post traumatic stress disorder symptoms.  (*Id*.)  Dr. Karp diagnosed mild to moderate post traumatic stress disorder; depression; cannabis, tobacco, alcohol and stimulant dependence, not current; personality disorder; history of back injury; extreme psychosocial stressors and assigned Plaintiff a GAF score of 60. (R. at 160.) Dr. Karp believed that Plaintiff had a slightly impaired ability to concentrate and persist at tasks of basic work due to feeling of sadness and occasional intrusions of past traumatic experiences.  (*Id*.) Dr. Karp opined that Plaintiff had a moderately impaired ability to interact with the general public and co-workers because of marked irritability and feeling that she might hurt someone.  (*Id*.)  Due to this impairment, Plaintiff would have difficulty adapting to working with co-workers or adapting to changes in the work-place.  (*Id*.)

15

On December 21, 1998, Dr. R.E. Pennington, M.D., Ph.D. performed a disability determination. (R. at 161-163.) Plaintiff reported lower back pain, with numbness and tingling down her right leg, right foot, neck, right shoulder and right hand. (R. at 161.) Plaintiff also reported intermittent headaches and tingling in her fingers. (R. at 162.) On examination, Plaintiff appeared extremely depressed, had mild tenderness over her coccyx, and negative straight leg raising. (*Id.*) The right leg and arm were intact to pinprick and light touch. (*Id.*) There was mild neck tenderness, but flexion and extension were normal. (*Id.*) Dr. Pennington diagnosed chronic cervical lumbar strain, but could not rule out cervical radiculopathy and/or peripheral neuropathy. (R. at 163.) Dr. Pennington noted that there were no objective findings and recommended more tests. (*Id.*)

A March 23, 1999 MRI of the lumbar spine revealed severe posterior protrusion and extrusion of the L5-S1 disc indicating degeneration and moderately severe stenosis of the central spinal canal by the disc material. (R. at 172.) A study of the cervical spine showed reversal of the lordotic curve, degenerative changes with disc space narrowing at C5-6 with anterior and posterior hypertrophic osteophytes. (R. at 173.)

On August 5, 1999, Dr. Michael Schneier, M.D. performed back surgery on Plaintiff at University Hospital in Albuquerque. (R. at 176; 204-205.) On August 30, 1999, Plaintiff complained of headaches, nausea, vomiting, photophobia and tenderness in her right calf. (R. at 195.) The incision area was healing well, but was tender to palpitation. (*Id.*) Plaintiff's back pain was improved and she showed no neurological deficits. (R. at 196.) She was discharged to go home in good condition. (*Id.*) On February 15, 2000, Dr. Schneier wrote that Plaintiff continued to complain of lower back pain and right leg pain with S1. (R. at 185.) Strength and reflexes were normal and sensation was intact. (R. at 185.) Dr. Schneier recommended another MRI. (*Id.*)

16

On November 13, 1999, Plaintiff wrote that she started work on December 28, 1998, but was let go on January 7, 1999 because a doctor would not sign a medical release. (R. at 164.)   On June 1, 2000, Plaintiff wrote that she was having problems with bowel movements, needed to take laxatives, and was on pain medication.  (R. at 209.)  Plaintiff recounted that the post surgical MRI showed scar tissue and she was unhappy with the results of her surgery due to continued pain and numbness in her right leg. (*Id.*)  Plaintiff recounted that a Dr. Jacob wanted to start her on steroid injections, but she refused due to fear of an allergic reaction. (*Id.*)

At the first evidentiary hearing, on June 25, 1996, Plaintiff testified that she could not sit for very long due to neck and back pain.  (R. at 218.)  On a scale of one to ten, Plaintiff rated the pain at a six. (*Id.*) Aleve would lessen the severity for about fifteen minutes. (R. at 218-219.)  Plaintiff had difficulty getting out of bed. (R. at 219.)  Plaintiff estimated that she could sit for five to ten minutes and could bend over a little. (R. at 220.)

Plaintiff had problems concentrating, did not handle stress well, was anxious, and often thought about suicide. (R. at 220.)  Plaintiff was incapacitated by migraine headaches for two days at a time about two or three times every two weeks. (R. at 221.)  Plaintiff had difficulty sleeping and would wake up tired. (R. at 222.)  Plaintiff did not drive and had difficulty getting dressed. (*Id.*)

At the second evidentiary hearing, held on November 18, 1999, Plaintiff testified that she sometimes had problems with her hearing due to headaches.  (R. at 244.)  Plaintiff left her job as a cashier at Wal-Mart due to back pain.  (R. at 246.)  Plaintiff had also worked as a candy wrapper, cook's helper and baby sitter. (R. at 247.)  Plaintiff testified that she was unable to work due to her back surgery and mental instability. (R. at 248.)  She was depressed, had anxiety attacks and was undergoing counseling.  (*Id.*)

Plaintiff drove herself to the hearing and was able to drive locally. (R. at 250.) Plaintiff visited with relatives, attended church, saw her boyfriend, talked on the phone, watched TV and crocheted. (R. at 252.) Plaintiff was unable to clean her house and needed help doing the laundry. (*Id.*) She was sometimes able to do her own shopping. (*Id.*) Plaintiff was able to bathe and dress herself. (R. at 254-255.) Plaintiff could pick up a gallon of milk. (R. at 256.) Plaintiff could bend a little, squat if she held on to something, and go up and down stairs. (*Id.*) Plaintiff stopped drinking two weeks before the hearing. (R. at 257.) She had started drinking again in February 1999. (*Id.*) Plaintiff testified that she could do sedentary work. (R. at 258.) Plaintiff testified that she had attempted suicide about four or five months before the hearing. (R. at 266)

The ALJ asked Bertina Telles, the VE, to assume a person who could lift ten pounds, needed a sit/stand option, limited to relatively simple work consisting of one or two step processes, repetitive duties, in a non-public environment with a relatively low stress level. (R. at 281.) Ms. Telles testified that such a person could perform Plaintiff's past relevant work as a baby sitter and could also work as a production line worker, machine operator or ornament hand maker. (*Id.*)

**<u>Discussion</u>**

The Commissioner concedes that Plaintiff is entitled to a remand for further development of the record and a supplemental hearing. Specifically, the Commissioner points out that the record indicates that Plaintiff received treatment at Sunrise Mental Health Program, the Texas Panhandle Mental Health Authority, Patricia L. Erwin, MSW and Counseling Associates, but that these treatment records are not included in the administrative record. Plaintiff opposes a remand for further development of the record and argues that Plaintiff is entitled to an immediate award of benefits because she meets Listing 12.05(C), that the Commissioner failed to complete the administrative

18

record as directed by the April 1998 Appeals Council remand order, and that this case has been pending for eight years.

The district court has discretion to remand a case or to reverse and order an immediate award of benefits. *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993). Benefits may be awarded when substantial evidence requires a finding of disability. *Talbot v. Heckler*, 814 F.2d 1456, 1465 (10th Cir. 1987). A remand for an immediate award of benefits may be appropriate where "additional fact-finding would serve no useful purpose but would merely delay the receipt of benefits," *Harris v. Sec'y of Health and Human Svcs.*, 821 F.2d 541, 545 (10th Cir. 1987). The Tenth Circuit has referred to the length of time a case has been pending when reversing and remanding for an immediate award of benefits. *See Nielson v. Sullivan*, 992 F.2d 1118, 1122 (10th Cir. 1993). However, the Tenth Circuit has remanded for further proceedings when the record "does not substantially support a finding of disabled any more than it supports a finding of not disabled." *Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993).

Plaintiff argues that she satisfies Listing 12.05, Mental Retardation and Autism. ALJ Nail did not consider whether Plaintiff met the requirements of Listing 12.05(C). Listing 12.05 applies to persons having disorders initially manifesting during the developmental period, defined as before age 22, and states that a claimant is disabled if she has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *See* 20 C. F. R. 404, Subpt. P, App. 1, §12.05(C)

Substantial evidence of record establishes that Plaintiff meets the first and second prongs of Listing 12.05(C). Dr. Daugherty found that Plaintiff's verbal IQ was 68, her performance IQ was 80 and her full scale IQ was 72. (R. at 144.) While Dr. Daugherty wrote that this should be considered

a minimum estimate of Plaintiff's intellectual ability, Dr. Daugherty did not state that the results were invalid. (*Id.*) Plaintiff meets the requirements of the first prong because her lowest valid IQ score was 68, which is within the listing range of 60 to 70. *See* 20 C. F. R. 404, Subpt. P, App. 1, §12.05(C).

Substantial evidence also demonstrates that Plaintiff satisfies the second prong of Listing 12.05(C), which requires the claimant to have a physical or other mental impairment imposing additional and significant work-related limitation of function. 20 C. F. R. 404, Subpt. P, App. 1, §12.05(C). The Tenth Circuit has held that a decision regarding whether a claimant has a §12.05(C) significant limitation should closely parallel the step two standard, and is to be made without consideration of whether the claimant can perform any gainful activity beyond the analysis as made at step two. *Hinkle v. Apfel*, 132 F.3d 1349, 1352-53 (10th Cir. 1997). ALJ Nail found that Plaintiff has severe impairments as defined by step two, namely, degenerative lumbar and cervical disc disease, depression, post traumatic stress disorder, and a personality disorder. (R. at 19.) Plaintiff has a significant work-related limitation within the meaning of the second prong of Listing 12.05(C).

Although the record contains no direct evidence of Plaintiff's IQ before age twenty-two, "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001). Several appellate courts have held that, in the absence of evidence of sudden trauma or other factors that could cause retardation, IQ scores obtained after age twenty-two create a rebuttable presumption that the claimant's IQ was at the measured level before age twenty-two. *See Muncy*, 247 F.3d at 734; *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001); *Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.2d 666, 668 (10th Cir. 1989).

Dr. Daugherty administered the IQ tests on May 13, 1998, when Plaintiff was twenty-six years old. While the record contains no evidence of intervening trauma that could have reduced Plaintiff's IQ between the ages of twenty-six and twenty-two, it does show that Plaintiff required special education in elementary school. (R. at 140.) Defendant has not rebutted the presumption that Plaintiff's IQ would have been in the 60 to 70 range before age twenty-two. Substantial evidence of record demonstrates that Plaintiff satisfies the requirements of Listing 12.05C.

Substantial evidence of record establishes that Plaintiff has serious mental problems aside from her low IQ. Plaintiff was assigned GAF scores of 45 and 60. (R. at 129; 160.) The GAF score of 45 corresponded to serious impairment in social relations and occupational functioning. DSM-IV at 30. The GAF score of 60 corresponded to moderate symptoms (e. g. flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social occupational, or school functioning (e. g. few friends, conflicts with peers or co- workers). *Id*. at 32. Dr. Street, Plaintiff's treating psychologist, wrote that Plaintiff's mental problems restricted her daily activities to a marked degree and caused frequent impairment of concentration, persistence and pace. (R. at 149.) Dr. Street also observed that Plaintiff had experienced episodes of decompensation and intensification of her symptoms that caused her to withdraw from employment and work-like settings. (*Id*.)

ALJ Nail found in the alternative that Plaintiff likely had a disabling substance abuse impairment that would be material to a finding of disability. Substantial evidence of record established that Plaintiff's substance abuse had materially ceased by 1994. (R. at 129-130; 141; 160.) Thus, ALJ Nail's alternative findings is not supported by substantial evidence.

A remand for an immediate award of benefits is appropriate because additional fact-finding would serve no useful purpose but would merely delay the receipt of benefits. *Harris*, 821 F.2d at

545. This case has been pending for eight years. The Commissioner failed to complete the administrative record as directed by the prior remand order.  Despite two chances, the Commissioner failed to obtain Plaintiff's medical records and failed to properly analyze Plaintiff's mental impairment.  *See Nielson*, 992 F.2d at 1122.  For these reasons, the Commissioner's decision should be reversed and this matter remanded for an immediate award of benefits.

**Conclusion**

Upon review of the administrative record and the arguments presented, the Court has determined that Plaintiff's Motion to Reverse and Remand for an immediate award of benefits should be **GRANTED** and that Defendant's Motion to Remand for further development of the record should be **DENIED**, and that this matter should be remanded to the Commissioner for an immediate award of benefits.

**AN ORDER OF REMAND CONSISTENT WITH THIS MEMORANDUM OPINION WILL ISSUE.**

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**